Good morning, Your Honor. Let me make a suggestion here, maybe an inquiry. It may be the same one. We really have two cases, and I assume with the government having two counsel, that each of you is going to argue a separate case. Is that correct? Okay. So let's do this. Why don't you proceed with 10 minutes on the income tax and banking case, and we'll give the government 10 minutes. You have your rebuttal on your 10 minutes, and we'll finish that case, and then we'll go to the solicitation case. Thank you, Your Honor. So we have a situation here in which the law requires that Mr. Hinkson have purposely evaded a reporting requirement as to these cash withdrawals when he is defined by the regulations as an exempt person as to whom the bank does not file CTRs on each cash transaction. How can you say that when, in fact, there's no evidence that he was qualified by the bank in accord with the regulations? It's more than just saying it. It's a qualification by the bank, and he wasn't qualified by the bank, and the bank didn't, for obvious reasons, process him through those regulations. But the regulations do not define an exempt person as a person who is designated by the bank. They define an exempt person by certain criteria under Section D-2, and a designation is not one of them. Under a separate subsection, they impose on the bank an after-the-fact obligation to report the exempt person as an exempt person to the IRS. But we're dealing with a criminal statute here, Your Honor. What the government has to demonstrate is that an ordinary citizen reading these regulations would not say, a red exempt person, okay, I'm exempt. I don't have to worry about whether I put in $8,000 or $10,000 because there's no reporting requirement for me. The government would, in essence, say that these statutes provide clear notice that even though you read them and you know you're an exempt person, you cannot assume you're exempt until the bank has reported your exempt status to the IRS, which is an obligation that you don't have, but that they have. But let me ask you this. If someone is seeking to avoid scrutiny by the federal government, he or she cannot fully escape scrutiny by withdrawing excess of $10,000 and then getting the exemption because the bank will report to the government in the process of getting the exemption, which I'm assuming for the purpose of the argument is entitled, but the government will note, will see that amounts in excess of $10,000 are being withdrawn by this person. Is that correct? That's absolutely correct, Your Honor. And the structure of his transactions and the way he did, the government never saw that. That's correct, Your Honor, because the bank did not report the exemption. But if the government's theory of this case is that this person was sufficiently sophisticated to realize that even though they're an exempt person, the bank would still designate them and inform the IRS that they're an exempt person. Then the government's theory of the case is that what he was doing here was not attempting to avoid the CTRs because there would be no obligation to report them. These are clearly withdrawal payments. The government's position is that he was sophisticated enough to know that he wanted to foil the bank's designation requirement. Fine. That is a crime that they could charge. They did not charge it. It's not mentioned in the closing argument. Nowhere does the government get up and say to the jury, what this man was attempting to do was foil either the CTRs or the designation. No, their charge, I think, is that he was attempting to avoid scrutiny that comes with cash withdrawals in excess of $10,000. Once the government sees that, the theory of the statute for the reporting requirement is there may be some funny things going on here. The government may be alerted not to alert the fact of the withdrawal itself, but where's the money coming from? Right, but if the government's theory is that even though he was an exempt person, there was still a reporting requirement that he was an exempt person, then in order to be guilty of this crime, you have to know and purposely foil a reporting requirement. You have to evade the reporting. For the purpose of evading, that's what the language says. Right, but in order to evade a requirement, you have to know that it exists. Was there an instruction offered as to this theory of the payroll? No, Your Honor, and that's why even if we don't deal with the notion of being an acquittal here, if the government's theory is that he was somehow attempting, that he was an exempt person, but he had found a way to avoid the designation. Wouldn't it be your obligation to offer an instruction that would provide an exemption for this claim? Absolutely, Your Honor. In fact, it's everybody's obligation. This was a case in which a district court judge sitting on a motion said, okay, you may be right that there's an exemption for withdrawal payments, but whether there's withdrawal payments is a question of fact to the jury. Fine, and the judge said there'll be proper instructions on that. The lawyer who made that motion was replaced by other lawyers. The judge who ruled that way was replaced by another judge, but given that a ruling had been made that the question of whether the exemption applied was one of fact to the jury, then both the trial court and the lawyers had an obligation to the lawyer. The court had an obligation since the law was clear and the ruling had been made to instruct. The lawyer had an obligation. It was a different lawyer to ask for the instruction. He argued exemption as his one real defense to this charge, the exempt status. He argued it to the jury. We have a lawyer who didn't understand the process that if you are arguing that you're not guilty under a legal principle, the jury's not going to be able to acquit unless they have the legal principle from the judge. But given that you are – That last argument isn't that best pursued under ineffective assistance of counsel? And it is being pursued as ineffective assistance of counsel in this appeal, Your Honor. This appeal is like – This is precisely why we wouldn't entertain that argument here, because we don't have a record in terms of strategy and theory. I mean, the theory argued, I thought, was, well, basically, he didn't have any reason to hide anything because he was operating a legitimate business. That's what I thought his theory was. No, but he specifically argued to the jury. He was exempt. He mentioned the exemption, but the jury thought – could have thought he was making it up because they didn't get an instruction. Your Honor, I would submit under – I understand that the court could remand for a 2255 with the IAC issue, but this is a situation in which the defendant's counsel moved to dismiss on the basis of a legal exemption. They got a ruling from the court that the court would instruct on the nature of the exemption. A different lawyer argues the exemption to the jury, and quite frankly, and it's unfathomable for anybody who understands the role of fact and law in a trial, these lawyers don't ask for the instruction that the trial judge had promised to give them. There is no – I would submit as an alpharend where the court said the record is sufficiently clear to rule on this question, there is no conceivable basis why you would argue a legal principle to a jury and not have the judge instruct the jury on a legal principle when the judge is going to tell the jury, as he did, that all relevant law comes from me, not from the attorneys. So given the motion to dismiss, the promise of an instruction, the argument on the part of defense counsel, I think that we have a situation – it all comes down to this. When the government gets up here, when they make an argument, it will become apparent that the issue of an exemption was at minimum, the significance of which had to be decided by the jury, and there was no instruction on it. It was critical. If the court says that it wants to deal with it in a 2255 situation, all well and good, but, Your Honor, I earnestly submit that there is no – given the track record and the way the issue was framed during the proceedings, there is no conceivable tactical reason not to have a judge instruct on the very legal principle that you're facing. I mean, I understand the argument, and I understand from your perspective there would be no conceivable tactical decision. We don't know if something else reasonable or not may have gone through the lawyer's mind. It's difficult to know, but let's hear from the government.  Thank you, Your Honor. May it please the Court, my name is Alyssa Hart, representing the United States. I'm having difficulty hearing you. Okay. Is that better? Yes. Thank you. So, as Defendant's Counsel pointed out, the key question with regard to defendant's structuring conviction is whether a reporting requirement existed for the bank at the time that the structuring occurred. And it's clear that there was no such reporting requirement. The structure of the regulations dictate that before a bank is relieved of its duty to report transactions exceeding $10,000, they must file a designation with the IRS, designating that customer as exempt. The facts of this case demonstrate why the CTR system and the designation system is so important. The defendant failed to file personal income tax returns and failed to withhold and pay over payroll taxes for several years, despite the fact that he had substantial income and that he employed numerous persons. The IRS has a strong interest in tracking the large cash transactions of such individuals in order to enforce the laws of the Internal Revenue Code. As this was submitted to the jury, what was the issue that was being debated with the attorneys? I'm sorry, I don't understand. What was the issue that the attorneys in their final argument were debating as the matter was submitted to the jury? With respect to the structuring charges? With respect to anything. Okay. Well, with respect to the structuring charges, the question was whether a defendant had willfully broken up large cash transactions into smaller transactions in order to avoid federal currency reporting requirements. There was no question about there being an exemption? A defense counsel did mention the exemption in his closing argument, but I believe those arguments could be interpreted as indicating that the defendant had nothing to hide. The defense's primary theory with regard to the structuring was whether a defendant was really involved in the withdrawal decision. So his office manager, Jerry Gray, testified that she was the one who made the decision to withdraw $9,000 on Thursday. If there was no reporting requirement, then can you be guilty of breaking up your money into smaller transactions to avoid a reporting requirement? No, there must be a reporting requirement. The statute is clear on that. So whether or not there's a reporting requirement depends on whether someone is exempt. Is that correct? In other words, maybe I should say it more carefully, and that is if someone is exempt from the reporting requirement or if a transaction is exempt from the reporting requirement, then there would be no reporting requirement. Is that correct? That's correct. But the duty to report did not go away until the bank has designated... How broadly should we construe the term reporting requirement? That is to say before someone is entitled not to have his transactions reported, he has to get a designation by the bank as exempt. Correct. And prior to that time, while he's in the process of getting that designation, his transactions are reported to the government. Isn't that right? That's correct. So even if he's exempt, there is some reporting before he finally gets the designation as exempt. Yes. So even if defendant does satisfy all of the requirements for a payroll customer, until he is designated exempt by the bank, the bank has a duty to report any of his transactions exceeding $10,000. Was there any evidence here put in such that he attempted to show that he was, in fact, exempt in terms of the fine requirement for holding an account such as this? I don't believe there's any evidence in the record of such an attempted showing. The defendant's wife did request that the bank designate him as a payroll customer in 2004, well after the structuring occurred. The structuring occurred in late 2000, early 2001. But I guess my question is during the time of the structuring or whether he had broken up these transactions during that period, did counsel offer any evidence that would support his qualification as an exempt payroll account under the regulations? There was evidence presented at trial that the withdrawals were used for payroll, and the government doesn't dispute that those withdrawals were used for payroll. But I don't believe there was any evidence that that information was ever presented to the bank in the form of a request for a designation.  Any evidence that he held the account for the regulatory time period? I'm not positive. I believe he did. The government doesn't dispute. I believe he had the account for a year. However, we do not concede that he meets all of the requirements for a payroll customer. The regulation, subsection D27, is where the payroll customer exemption can be found in the regulation. And Part E of the payroll customer requirement indicates that the customer must regularly withdraw more than $10,000 in order to pay its United States employees. And as I said, we don't dispute that the money was used for payroll. However, we think it's clear that Defendant did not regularly withdraw more than $10,000. If Defendant had regularly withdrawn more than $10,000 in a single business day, there would have been a track record of CTRs that would have put the IRS on notice. Is it the catch-22 that he didn't regularly do it because he was making them for less than $10,000? I mean, what's the government's argument there? I'm not sure how it's a catch-22. The regulation requires that in order to be a payroll customer, he must regularly withdraw more than $10,000. And because these transactions were not occurring within a business day and were not triggering the reporting requirement, he cannot meet that requirement. It does sound like a catch-22. Okay. I mean, even if – and again, it's our position that even if he does meet all of these requirements, the designation is not required. I'm going to figure this case out because there are some little tricks in here. My sense of what happened is that as he was – or I'll say that he – as he was withdrawing these amounts in less than $10,000 amounts per day, he thought that he was subject to the reporting requirement, and he was unaware of the payroll exemption. So I think what he thought he was doing at that time was simply avoiding the reporting requirement. It turns out that there was this exemption for payroll, but even within the exemption for payroll, if he had withdrawn it in $10,000 amounts, there would have been other reporting requirements, although after the initial approval period, the reporting would no longer have occurred. Does it matter that he misunderstood what the reporting requirements were, or does it only matter that he was trying to avoid reporting requirements that in one form or another would have applied to him? I don't believe that – I don't believe that the form of the reporting requirement matters. I think that the statute makes clear that a defendant must willfully either avoid or attempts to avoid reporting requirements. Does it require that he actually understand what the reporting requirements are? That is to say, understand them precisely? I think what the argument of the other side is, yeah, he was attempting to avoid requirements, but the requirements that he was attempting to avoid didn't apply to him, so it doesn't count as a crime. Again, I think that he was – the fact that a reporting requirement existed, the defendant's challenge to his structure and convictions is that there was no reporting requirement to avoid, and accordingly, the fact that a reporting requirement existed, because the bank had never designated him as an exempt customer, means that his convictions weren't entirely proper. Let me ask you this. This is now sort of an ad absurdum version of this. Let's say that someone needs to withdraw, for illicit purposes, $5,000 in the relevant period, and he thinks that the requirement for reporting is anything over $4,000, so he structures. So he withdraws only $2,500 at a time, thereby no longer – not triggering the reporting requirement that he thinks exists. So he's attempting to avoid a reporting requirement, but he doesn't understand the reporting requirement. The reporting requirement is $10,000. So he could have done exactly what he wanted to do without triggering it. Is he guilty of a crime of attempting to avoid a reporting requirement? I don't believe so, because there is no reporting requirement in that case. So in order for you to win here, you have to show that there was some actual reporting that would have happened had he withdrawn $10,000. And your argument is, even if he was qualified for the exemption because it was payroll, there would have been some other reporting requirement that he didn't fully understand, but that there was going to be some reporting. I'm not sure that the two reporting requirements are as distinct as you're suggesting, Your Honor. Well, it's going to be reporting in order to qualify him for the exemption. And once he qualifies, then the bank doesn't have a reporting requirement. Once he's designated. Once he's designated. Once he's designated. However, until he is designated, the bank still has a duty to file CTRs. What's that? I'm sorry, a DTR? Sorry, the currency transaction reports, which are the – so even if the defendant had met all three of the – not all three, pardon me – all of the requirements for a payroll customer, until the bank specifically designates him as an exempt payroll customer, if he were to withdraw more than $10,000 in a single business day, until the designation is filed, I think the regulation gives the bank a 30-day period to file the designation. I don't know the answer to this question. If he had been clever and if he had walked into the bank and said, this is for payroll purposes, I don't want to withdraw now, but I will in the future, and I'd like to get my sort of designation, my qualification now, could he do that without ever actually physically doing a withdrawal before the reporting to the government occurs? So far we've been working off the premise that he's withdrawing, you know, $10,000, and this is during the approval period, but can he get the approval without actually doing any withdrawals? The regulations indicate that the bank – is after the day of the first reportable transaction in currency. So that suggests that he would need to have – have to deal with – in other words, you need some transactions to establish the regularity, correct, to fit within the regulation? Yes. So he can't get – he cannot get the exemption of the designation as qualified for the exemption without actually doing a couple of these withdrawals? According to the regulation. I have a question with regard to that. The request to the bank for the document had to be filed to the bank. Does that only mean that the bank doesn't have to report it, or does that really affect the exemption itself? The bank must designate the customer as exempt in order to be relieved of its duty to report. So there is a duty to file currency transaction reports for transactions exceeding $10,000 until the bank has designated the – has designated that customer. So the exemption from the reporting requirements does not occur until the bank has designated the customer as exempt to the IRS. Thank you. Thank you. A few quick points. The government just said something that means it doesn't understand the trial process. It said it doesn't matter what requirement Mr. Hinkson might have avoided or intended to avoid. You cannot convict – under McCormick v. United States, under Cole v. Arkansas, you can't convict a defendant on appeal on a theory that was never mentioned to the jury. The notion that Hinkson was trying to avoid a requirement that the bank designate him as exempt, if that was the government's theory, they had to argue it, they had to present it, they had to charge it. They never mentioned that theory, that he was attempting to avoid the 4D requirement to the jury. Let me ask this. A defendant goes into a bank, says, I've got cash withdrawals. The bank says, okay, fine, don't worry about things. We'll take care of it. They don't. Is he guilty if he withdraws, you know, several installments each week? Of course not. Why isn't he guilty? He can't be guilty. He cannot possibly be guilty because he had no intent to avoid the bank reporting the designation. So the question of whether this man was attempting to foil the reporting of his exemption is a question of fact that has to be decided by the jury under proper instruction. Given the nature of this argument, given the Court's questions, the Court would have to agree that the issue of exemption should have played a role in the Court's instructions to the jury, and it did not, even though the district court said there would be instructions on the exemption requirement in denying the motion to dismiss solely on the grounds that it was a question of fact that these were withdrawals, and as the government has conceded, they were withdrawals. He is an exempt person. Was this a common ground? But we're reviewing this on plain error. We are reviewing this on plain error. Yes, Your Honor. You are reviewing this on plain error and ineffective assistance. Yes, Your Honor. Thank you. The case just argued, United States v. Hinkson, number 05-30. 305 is submitted. I will now argue the second case, United States v. Hinkson, and this is number 05-30303. Take a moment if you want to get some water. Again, Your Honor, Dennis Burton from Defendant Hinkson. The three charges of which Defendant Hinkson has been convicted in the second appeal, soliciting the murder of federal officials, are certainly very serious as evidenced by the fact that the district court sentenced Mr. Hinkson to 33 years in the maximum administrative anti-terrorist unit at the basement of Florence, Colorado, as a result of these convictions. It's effectively a sentence of life without parole for a man Mr. Hinkson's age. But at the same time, the crime here is, in a very real sense, very ephemeral. The crime is supposed to be, is alleged to be the enunciation of certain words in a conversation in either December or January 2002-2003 between Mr. Hinkson and one Elvin Swisher. It's words. And because words are so frequently misinterpreted, misheard, misreported, said in jest, Congress has taken upon itself to impose a corroborating requirement of serious circumstances, strongly corroborative of the defendant's intent to commit the crime of violence that he or she solicited. Without that corroboration, there is no crime, there is no conviction, and I think it's fair to say that the government failed on, what, eight other charges to prove that kind of seriousness in terms of alleged statements to other individuals. There isn't any, the kind of corroboration you see often is tape recordings of identification, evidence of it, the supplying money or guns to the person solicited frequently in sting operations. Here, none of those facts exist. The government offered one corroborating circumstance of this supposed solicitation, and that is Mr. Swisher's character and experience. It gets up an opening argument and says Swisher was, quote, a combatant in Korea during the Korean conflict. He was not adverse to this kind of violent, dangerous activity. So what this case is about is, is Mr. Swisher credible in terms of what he says about the conversation and how he presents himself to the jury, what he says about himself? And we now know, and I assume the government is willing to concede this, we now know that he's not a combat veteran from Korea. He is as bold-faced a liar as ever taken the stand in a federal courtroom. So the prosecutor in the opening statement misstates what the evidence will eventually show, at least to us. I'm not sure to the jury, but to us. That's right, Your Honor. He tells the jury something, and at this point no one's making accusations of misconduct in opening statements. He tells the jury something that is not true. That doesn't mean it's a knowing falsehood. He says it's not true. He tells the jury that this is a man who we will prove to be a living, corroborating circumstance because he's a combat veteran. And then, so the question we have is, given that they had approved who, what Swisher, that what Swisher said about the conversation was true and what he said about himself was true, the simplest way to resolve this case is simply to say, by the time of the new trial motion, what do we know to be true that the jury wasn't told? And that is that Mr. Swisher walked up to the witness stand, planned to commit perjury, carrying forged documents for the purpose of committing perjury, wearing a purple heart for the purpose of deceiving the jury. In this case, in this case. Secondly, that he lied nakedly to the prosecutors on the day he testified about the same things that he lied to the jury about because the record demonstrates, as Mr. Sullivan said, I actually queried him about this because there was a problem with his state. And he said to me, here's my documents. It was behind enemy lines in North Korea after the war, Rambo-like operations to free prisoners. This court in Bernal said when a witness lies to the prosecutor in the course of an investigation, the jury is entitled to know that. And finally, we know that his lies to the jury were inextricably intertwined with his lies to the Veterans Administration based on the same forged documents by which he has been ripping off the American taxpayer on the rather despicable lie that he earned a purple heart, a silver star, and so forth in Korea when all he did was be disciplined while being a Marine and he was involved in a car accident in Washington. He never got close to combat. So, this court can simply rely on Mesherov and his own opinion in Young. A conviction obtained by perjury testimony cannot stand. We have irrefutable evidence of the perjury. The argument of the Fifth and Sixth Amendments do not guarantee a defendant the right to present such evidence in his or her defense is unworthy of any official sworn to uphold the United States Constitution. Mr. Ridden, let me ask you this. Do you know what this so-called purple heart that he wore on his lapel looked like? I don't. I don't. All I know is that when asked to refer to it as a purple heart, I certainly have the impression that it was a reasonable activity or actually was a purple heart that he had obtained by some means, certainly not being wounded. It's described in the record intermittently in various ways, but a couple of times as a replica purple heart. Maybe the government will be able to help us out on this. On the 608 argument, let me just be brief on this. There is no judge who could possibly say that if you want to ask a witness, let me ask you, Mr. Witness, did you come to court today prepared to lie to this jury that that's an irrelevant question or a question that goes to character, that goes to the line in this action? If that witness says, no, I didn't come here, and there is a tape recording from the day before, verified and indisputable, that he said, I'm going to go to court and lie tomorrow to Hinkson's jury, that that is character evidence. That is evidence aligned in this action. And that's what occurred here today in this case. I'm trying to put it, though, I'm trying to put the trial in the context of how it happened. I mean, the question, he shows up, he testifies on direct in passing on this subject, right? And then the defense attorney basically asks him, well, do you have any documentation of that? And, of course, that's when he pulls out this false document. So now we have him, of course, corroborating himself with this false document. Is the error in your view that the judge didn't let the defense attorney cross-examine sufficiently or that the defense attorney was unable to complete an impeachment by using these various naval service documents? To begin with, I would just say this. He did not testify in passing because he said, in this instance, he said, I told Mr. Hinkson that I had killed many people in combat. He asked me, I said, too many people in combat. I told him I killed the defense of myself and my friends. The description of combat was not in passing. Okay, let's just stop there, though. To me, there's sort of an initial threshold question of whether his lying matters if that's what Minster Hinkson heard. I mean, he can lie and inflate and say, look, I was the world's greatest guy in the Korean conflict and I killed a bunch of people and I'm a tough guy. So if that's what he said and Mr. Hinkson heard that, then why does that matter that that's a lie? Well, that's the big if, Your Honor. That's the big if in this sense. I mean, that's his testimony. At least that's the first testimony that he gives. Right. So what Your Honor, the question Your Honor is posing is if he tells Mr. Hinkson a huge pack of lies and Mr. Hinkson believes them, then the fact that they were all lies might not matter. But Mr. Swisher didn't get up and say, look, I'm a big, fat liar, and I told Mr. Hinkson some of the most unbelievable fish stories you've ever heard, and I am a liar, and I lied to the administration, I lied to the prosecutors this morning about it. But, you know, apparently he believed me, and the jury decides that. That's one thing. What the jury was deprived of is the ability to know that everything he told Hinkson was a lie, everything he told the government was a lie. And I'll tell you this. If the jury knew that he was such a big liar, they're not going to say, oh, yeah, but I believe it's beyond reasonable doubt that he reported verbatim his conversations with Mr. Hinkson about this solicitation. Okay. Well, now let's go to phase two, which is now he's attempted. Okay. Which is, Your Honor, I would phrase it this way. You asked me what the error was. Right. That's what I'm trying to get to. The easiest error is that once it became clear that the government had called a fraud to the witness stand who had approached the witness stand intending to lie to this jury, the error was in denying the new trial motion. If we move back to the case in the case itself, the error by the judge was denying the defense the ability to put in evidence the very documents that, by the end of the trial, would have proved Mr. Hinkson a liar. So stop there, and that's where I'm trying to reconstruct what the trial lawyer would have done. It was unclear to me exactly what that meant, that the documents can't go into evidence, when what I was imagining would happen when the judge says, well, we can reopen cross-examination. So now with these documents in hand, the defense attorney can go up and start asking him, and if he is, and they have it with the documents in hand, that never happens. So we never have an impeachment on those documents, which the judge seemed to permit, so we never know the answer to the story, which is what then would have happened in order to complete the impeachment. No, but we know this. We know this. We know that the judge erred when he said you can't put in evidence in the documents. The judge has a cross-examination code when you're dealing with a pathological liar like Mr. Swisher. Isn't it true that you don't have a Navy Cross? No, I have a Navy Cross. Isn't it true that you don't have a Purple Heart? No, I have a Purple Heart. Isn't it true that you never served in Korea? I absolutely served in Korea, classified operation. Hasn't the Navy said that you didn't serve there? No, but they never served there. There are no documents to that effect, and the jury then goes into the jury room and says, well, he asked a lot of leading questions, but where's the truth? Well, but then I guess what's unclear to me is to what use the defense attorney was precluded in terms of the information and the source of those documents. That's what's unclear. He was precluded from getting up and closing it, saying, ladies and gentlemen of the jury, this man said he has a soul to start. Stop. That's getting to the closing, but he forewent. Okay, this is my question. The defense attorney forewent his opportunity to go back and cross-examine for which he could have used those documents for exactly the kind of cross-examination that you're talking about here, and that's where I'm having some problems. Of course he can't get up and closing and say, and here's this document, because the document hasn't even been marked for purposes of impeachment, for impeachment, not necessarily admission, but for impeachment purposes. So my question is, it wasn't clear to me that the judge wasn't permitting the information for impeachment purposes as opposed to substantive evidence. Do you see a difference between those two? I do, and here's the difference. His counsel was absolutely entitled under the rules of evidence to stand up in closing and say, look at Exhibit 14. It's been admitted by the trial court here. It is an official record of the government. It's an official record that tells you that everything that this man said was a lie. What the judge said is, all I'll let you do is ask those questions, and then when you get up there and say, I asked him questions about this, the jury is not going to be able to say, but where's the beef? If there was an official report, why didn't we read it? And I did have one important point on this, Your Honor, because read Hinkson's cross-examination. It's 130 pages. It deals with every conceivable topic. Did you ever say you were hired by a mob lawyer? At some point, it gets into the issue of whether he had signed a draft partnership agreement with a marked ballon, and at that point, the prosecution says, I want to put into evidence the draft agreement, which deals with this collateral matter of whether there was a partnership. Trial court says, in it comes. The agreement comes in. 500 pages later, it's saying that these are relevant matters for impeachment, but you can't put in those under 608 when it's made a contrary rule 500 pages before where the defense was concerned. We don't have two sets of rules for the prosecution and defense. But the critical thing, Your Honor, is maybe, maybe the defense lawyer, if he had tried to cross, would have gotten the message across. He had tried to cross Mr. Hinkson before, and he started pulling out phony documents from his pocket. But the point is he shouldn't have faced that choice because those documents, Your Honor, are absolutely admissible, and there is simply no basis under 608 to exclude them. 608 had been amended before this trial precisely to prevent trial judges from making the erroneous ruling made by the trial judge here. The erroneous ruling was, oh, you can't put in external evidence if it goes to credibility. No, you can't put external evidence in if it goes to a character for untruthfulness. These documents were going to be admitted to show that this man got up in front of this jury and lied to them. He had planned to lie to them. It's got nothing to do with character. Well, I mean, your point is that he's sitting there on the stand with the thing in his pocket, which is his credibility at that very moment is the actual documents that they want to attack, his false card, correct? Correct. Which is a credibility, not a character issue. That's right. We know from the false document that he approached that stand prepared to pull out forged documents to standing the defense. Here's the defense problem. For all it knew, if it started to cross without being able to put in the real government documents that prove what a liar this man was, maybe he had five other documents in his pocket, five other phony documents. Oh, you've got a document? How about my phony document? These are government records that show this man is a disgrace to the United States and the United States Marine Corps. Why not have the government get up in closing and say, you know what? We didn't know when it started, but we now know that these claims of combat duty are false, and that, therefore, he was lying to Hinkson when he said they were false. So don't credit that testimony. But if you believe that Hinkson believed his lies, you can find that, nonetheless, that the solicitation was serious. The government could have done that, and it should have done that. And we should ask Mr. Taxay why he didn't do it. There's only one very good reason why he didn't do it. It was the kiss of death. Okay, so let me just say that in the case of back for trial, the little purple star goes in the garbage, correct? Right. And, you know, and he doesn't make these claims. So then it's going to be very similar to what you just said. In other words, it's not going to be the argument about whether or not he actually had a combat star. He just says, I was in combat. If he gets up and he says, well, I told you I was in combat. Well, I know, but he gets up and he says, look, I was, you know, I was a Marine and I was in combat. So then the only issue then is was he not in combat? Well, he says I was in combat. Okay. But he's not going to say that the second time around, right? Well, he's not going to get on the stand the second time around, Your Honor, because the fact that he committed perjury the last time, the fact that he's been ripping off the – the government can't put him on the stand again. If it's got some other way to prove up this charge or some other charge, fine. But if the government chooses to put him on the stand, he either says again, oh, I told him I was a combat veteran, and faces the fact that he's a liar of this kind, or he says, look, I lied under oath the last time consistently, but I did tell him I was a combat veteran. That was a lie. I perjured myself a dozen times the last time. But, you know, he really did have that conversation with me. Fine, let's go to the jury and have them decide it. Let's hear from the government. Okay. Thank you, Your Honor. I'm Mike Taxay from government. Did you try this case? I was one of two trial counsels, Your Honor. Perhaps the place to begin is one of the points that counsel left off with, asking why did not Mr. Taxay and myself raise this point in closing argument. For the same reason defense counsel didn't raise this point in closing argument, because if defense counsel's request, all of that information had been stricken from the record, there was a court order striking it, the defense could not refer to this information, just like the government couldn't refer to this information. It was not part of the case. Let me ask you this. You were in the courtroom when Mr. Swisher testified? Yes, Your Honor. Tell me physically, just what did that purple heart look like? Was it actually purple and heart-shaped? I honestly can't say. I did not handle Mr. Swisher's testimony. Did you look at him? I saw him. It was from a distance. I honestly didn't see this little lapel thing. While he was testifying on cross-examination, when it was pointed out, I couldn't really make it out. I honestly don't know what it was. I have never served in the military. I don't report to be an expert with respect to military medals. I saw they had something on his lapel. I don't know what it was. Did you handle any of the inquiry as to whether or not this little thing he whipped out of his pocket, his DD form, was in fact authentic? No, Judge, that was not. It's been a long time, but I don't believe I was involved in that. I know an FBI agent went and got the, I guess it's called the Gallon Report from the Veterans Affairs, State of Idaho Veterans Affairs Agency, but I didn't handle Mr. Swisher. I don't believe I was involved in that at all. Were you essentially second chair? Yes, I was, Judge. I picked up the case about a month before trial. And Mr. Sullivan, was he a local U.S. attorney or was he also out of D.C.? He's out of D.C. He's also out of D.C. Let me ask you a couple of things because it appears that who had what documents when makes some difference here. Let me start with the two DD-214 documents. The first one, the document we now know to be false, the one that Mr. Swisher pulls out of his pocket, when he's testifying on the 14th of January. The government, if I understand the evidence in the record properly, the government is aware of that no earlier than that very morning? As I understand it, I did not participate in this witness prep session. What Mr. Sullivan said on the record was that he had received a copy of this from Mr. Swisher at 9 o'clock in the morning. I believe that's what he said that day. Yeah, that's what the record says. So the government, according to the evidence in the record, sees that DD-214, the so-called replacement 214, for the first time on the 14th. Then there is the true DD-214. And when does who get that? That's not grammatical. What happens is that the judge subpoenas the personnel file. It comes in the middle of the trial. The personnel file arrives in the middle of the trial. In our brief, the specific date, but my vague memory is it comes about the 21st. Okay. So it's well before closing arguments. And so that's when the personnel file comes. Well, that's not what you say in your brief. On page 51 of your brief, you say the defense got the original form, DD-214, on 15th January. I'm on page 51. Right. That's because, as I understand it, Judge, the defense had been looking into Mr. Swisher's military background for some time. They had held, without telling the government, their concerns about whether or not Mr. Swisher's been telling everybody a big lie about his actual military service. Apparently, the plan was to spring this on the government in the last second if the government chose to call Mr. Swisher. The defense made a tactical decision not to express this to the government. So, as I understand it, they've been investigating him for some period of time. They, on their own, after Mr. Swisher testified, went and found some DD-214 that had been recorded. I guess it was a recorder of deeds. By Mr. Swisher, apparently. Apparently, he records these documents down if you can't record them all. Yes, Judge. Yes, Judge. For reasons I don't understand, but okay. So it was the defense that found this relatively easily, it seems, one day after the testimony. They had been suspicious of this for a long time. And how do we know that they got it the day after? I believe there's a fax footprint on it. My memory of that record is that it was faxed from Mr. Henson's plant in Grangeville, Idaho. That's what I remember of the document. I believe it's state stamped up on top. Okay, so it's the fax line at the top that tells us when the defense got that. And they did it the day after Swisher's testimony. That's my memory of the fax, Judge. And are you making some argument that if they had it then, they should have done something more promptly about it? Well, yes, and that's what the judge found. In fact, Judge Solomon found that they had been investigating Mr. Swisher's actual military record for, I think, three months prior to trial. And had these concerns about whether or not Mr. Swisher had actually served in military service. Made no comment to the government. Issued no subpoena for the record. Took no steps to let the government know of their concerns. How about how there's this so-called Dowling letter from Lieutenant Colonel Dowling that the government provides to the court on the morning of the 21st. When did the government get that letter? Be careful in answering this question. I honestly don't recall the specific date. My understanding is not long before it was disclosed. And your understanding is based on what? My memory of Agent Long getting this document and Mr. Solomon providing it to the court. The descriptions of when this comes in vary a little bit. The government at some point, for example, in its response to the motive of a new trial says that the government received it, quote, a few days earlier, a few days before the 21st. Your brief says on or about the 20th. If you would turn to the record, let's do excerpts of the record, but that's probably the easiest way to do it. I have to apologize, Judge. I took the wrong excerpts of record. I grabbed... I bet Mr. Reardon can help you out. Okay. If you can just take Mr. Reardon's excerpts of record and turn to page 71. Yes, Judge. And look at the fax line at the top from the Idaho State Veterans. What's that say? January 13, 2005. So that was faxed from the Idaho Veterans Department the day before Mr. Swisher testified. And it could only have been faxed to the government because it was the government seeking that document and it was the government that presented that very document finally on the 21st. I can tell you that I don't know anything about this. I suspect that it was Mr. Henson that was investigating this. No, that can't be right. This is the document that was provided by the government to the court on the 21st of January. Yes, Judge. And it has a fax line at the top from Idaho's Veterans Department. And it was Agent Long who was searching for this. And, in fact, at various points it's very clear that Agent Long was searching for our documents from the Veterans Department and it was Agent Long who got this very letter from Dowling. Judge, if I may, I think I understand the point that you're making and the concern that the court had. If you read the first line, it says, This is in further reply to your letter of January 3, 2004 to the Personnel Management Support Branch of this headquarters. Yes. And so this seems to be following up on a prior inquiry that had been made almost a year earlier. What the letter is about is it's a reply to Mr. Keeley, who is in the Idaho Division, because Mr. Keeley, for reasons that are not entirely clear from the record, has become suspicious about Mr. Swisher. So he has written in January a year earlier to the government of Washington, D.C. to say, Could you check on this? And this is their response. Mr. Dowling dates that letter the 30th of December. There's another stamp of looks that was received by the Idaho Veterans on January the 10th. But this letter was generated, obviously, in response to a question raised by the Idaho Veterans people because they were suspicious. And it appears to have been then faxed to the United States government on the 13th of January. Judge, I did not know that it was faxed on that date. And I was just right there at the top of my head. Do you know what Hoyt law is? Hoyt law? Wesley Hoyt was defense counsel. That's right. Okay. So that's what I'm just trying to understand from the document, is it seems that there are two fax lines. Okay. So I see Hoyt law on February 3? I see March 03-03, Judge. Okay. Excuse me. March 3. March 3. 2005. So that's the defense counsel, correct? Yes, Judge. And do you know whose fax number is the 208 fax number, which is the one on the bottom? Yeah, I know 208 is a Boise number. I didn't know that, but do you know whose fax number that is? In other words, do you recognize that as the U.S. Attorney fax number? No. Okay. I can tell you. The original, now what we have here is excerpts of records that come out of Mr. Hoyt's file. The original that's in the court file has only one fax line across the top. The Hoyt line is one. The original that's in the court line only has the fax line from the Idaho Defense Department. And that 208 number is the fax number of the Idaho Veterans Department. Okay. Well, all I can say... This doesn't look very good to me. My understanding is, I know I had nothing to do with this inquiry, part of the data from Mr. Swisher's testimony. I can say that for a fact. And it's my understanding that the prosecution team, including the FBI, had nothing to do with this. I also know that the defense has long been investigating Mr. Swisher's background. And my speculation, and I should say it's no more than speculation, is that the reason why this inquiry, why this letter was received, is it was in response to inquiries that Mr. Henson had been making, that he had contacted the State of Idaho Veterans Affairs. No, that's contradicted by the record. It's very clear in the record that when the government hands over this letter to the court, the court says, Agent Long got this from the Idaho Veterans Department. Agent Long is your guy. Oh, I understand. So your concern is... My concern is, when did Agent Long get it? The fax line says that he got it on the 13th, the day before Swisher testifies. And, of course, Brady Giglio material is Brady Giglio material when it is in the hands of the government, not merely when it's in the hands of you or Mr. Sullivan. It is my understanding that this did not go to Agent Long on the 13th, the day before Mr. Sullivan testified. And your understanding is based on what? Now that we have this fax line right in front of us, and we know that the government had represented him, that the source of this letter is the Idaho Veterans Administration, and he got it from, and Mr. Long, on behalf of the government, got it from. This document, Judge, does not say who the recipient of the fax was. That's correct. And so I do not believe, based on what I understand of the events, that Agent Long got this document on the 13th. I don't know who got it, but I don't believe it. In other words, you're saying that there's a fax line there, but that doesn't necessarily tell you anything about when it came into the hands of the investigating officers or the investigators. Exactly. I'm not an expert in fax lines. Who else could it have been faxed to? Well, the way I understand this document, Judge, is that it was faxed from the Navy to the Idaho State Veterans Services on the 13th. This reflects the receipt by the Idaho State Veterans Service. You really don't know about fax lines, then, because that's what you think. The fax number on a fax line like this is always the fax number of the sending machine. I can't explain it, and to my knowledge, Agent Long did not receive this prior to... Who would have received it? Who would have? Tim, you're walking along. I understood, and perhaps I'm wrong, Judge, maybe you're right. I understood that it was the Idaho Division of Veterans Services that received it from the Navy. They did, but they received it on the 10th. It was sent by the Navy on the 30th. I can't explain it. I honestly have no idea. Let me get back to... First, if I may just respond to the judge's concerns. I heard nothing about this dowling letter until after Mr. Swisher testified. I do not believe that Assistant U.S. Attorney Sullivan, who's out of Miami, knew anything about this letter prior to Mr. Swisher's testimony. And I don't believe Agent Long knew about this letter. And I don't believe that this letter in any way reflects that any member of the prosecution or investigative team received the letter. Well, they clearly received it because they say they received it. The only question is when. And I don't know the specific answer to that question, Judge. There were representations several days before. It's not in the record, it seems to me, the timing, except in general terms. It's my understanding it was received by the government after Mr. Swisher testified. That's what I understand. Even if it were received a few days before the 21st, which I have to say I'm skeptical given the facts line, why doesn't the government have an obligation to turn it over immediately? The government turns it over only on the morning of the 21st, which is the day that the packet of personnel file materials are scheduled to be delivered later in that very day, which, of course, then they are. Why does the government wait? My memory of what happened is that there was a weekend in here, that the materials came to the court Friday as the 14th, 21st as the 14th. You hand it over on Friday. Why didn't you hand it over a few days before? If you got it on Tuesday, why didn't you hand it over on Tuesday? What I remember about the – I can't answer your question, Judge. I don't – I just don't know. Let me get back to the effect of the judge's ruling. You had begun your argument saying that the court had stricken the information and that was a request to defense counsel. Could you put that in context in terms of, you know, the judge comes back and says he's made a mistake at one point about the – he's not admitting anything before the court and the jury should ignore all that information. But did all that come about after the judge said that he wouldn't let defense counsel actually put in any of these maybe documents? Yes. What happened was that, to be perfectly clear, the question was asked of defense counsel. The way this transpired was during the government's direct examination, the government asked what Mr. Swisher had told Mr. Hinson about Mr. Swisher's military exploits. The government did not ask, what were your – what did you actually do in the military? So that was never out there. On cross, the defense asked about this purple part, the pelican, and everything transpired afterwards. When Mr. – after Mr. Swisher pulled out this ED-214, which he characterizes as a certified replacement, it indicates he out-earned these medals. The – at that point in time, the defense said to the court that, as I recall, the defense felt like a cross-examination and backfired terribly – I believe those were the words that defense counsel used – and asked the court whether there was any remedy that the court could fashion. And what the court said was, well, you chose to go down this road, but if you would like, I could tell the jury that this is my fault. And so then the judge proposed an instruction. The defense agreed, and the instruction, the actual language of the instruction, was included in that court's – in the government's brief. So at that point in time, that's fundamentally what had occurred. Now, with respect to the appellant's concern, Mr. Hinton's concern, that he was denied an opportunity to conduct a full and fair cross-examination, I could address that briefly for the court. I don't feel that's accurate because the court was very clear. The court said that you could make reference to these documents, you could refer to them in your closing – in your cross-examination if you chose. I will – I, the court, will allow you to reopen. And the court said you can waive these documents underneath the nose of Mr. Swisher and ask him about them. You could say to Mr. Swisher, here is your personnel file. You have the certified replacement DD-214. Show me in here where this personnel file – in his personnel file, where this replacement DD-214 is located. No, he didn't quite say that. He said you can show him the document, but he didn't say you can ask him to show you where in the file it is. But you could say it's not included. It's not included in here, and please explain why. He said that you could use the Dowling letter. You could use the National Personnel Records Center letter. You could make specific reference to these documents and say explain, if you will, how the military has no idea that you actually served in military. Which would be the typical impeachment use of the documents. Exactly. And the reason why the judge did it in that way, and it was entirely appropriate, was that this was a collateral matter. This court, through the Castillo decision, has made clear what is part of the government's case for purposes of evaluating the scope of Rule 608 versus the scope of Rule 607. And what the Castillo case says is if something comes up undirected, if it's voluntary, then it's part of the government's case. It's the government's witness, and it's a voluntary statement, and it's part of the government's case. That clearly would be matters that are raised undirect, in respect to matters that are raised by the defense on cross-examination. This court has found that if the witness is responding to a direct question that's asked and specifically seeks to elicit this information, if that is not part of the government's case, and this issue doesn't arise on direct examination, it's not part of the government's case. It's part of the defense's case. Let me ask you this. In Mr. Sullivan's opening, he describes Mr. Swisher as a Korean combat veteran. Yes. In his questioning, he asks only, what branch of the service were you in? And when Mr. Swisher answers, the Marines, Mr. Sullivan asks no more questions as to what he actually did in the service. So he doesn't ask a question designed to elicit evidence that would support the statement he made in his opening as to what he actually did. All the rest of the questions, as he points out, as soon as all the big breaks loose there after the paper's pulled out of the pocket, he says all the rest of the questions were simply, I asked him what he told Hinkson. Well, so we have an opening statement that says he's a combat veteran. We have Mr. Swisher getting onto the stand, saying he's a Marine, and he's wearing a quote, and this is now the prosecutor's words, not yours, but Mr. Sullivan's words, a quote, replica purple heart during his testimony. Now, I think replica purple heart means replica purple heart. Why is that not direct testimony that he was awarded an award for injury during combat? Everybody and his dog, after the most recent presidential campaign, knows what a purple heart is. Of course, if that is direct testimony, not my words but my presentation, isn't that then a mistake under 608? Well, the first comment that I would make is that the court specifically found, and the court saw this lapel pin, whatever it was, and the court made a finding that what this thing was was unclear. And so the issue that you just raised, Your Honor, was not raised in the opening brief. It came up, and whether or not wearing of a button reflects affirmative testimony. Now, go with me for a moment, and you can dispute it if you like. How about wearing a replica purple heart? That is to say it's heart-shaped, and it's purple, and it's got the head of President Washington on it. Yes. I was going to go there, Judge. I apologize if I wasn't clear in that regard. What I'm trying to say is that since the issue hasn't been briefed specifically on this appeal, I'm now speaking from memory and have a vague memory of the case and don't know the name. If you'd like, I can give it to you. Below, there was briefing on essentially a subject, and the question really was the wearing of a button, affirmative testimony. And there is some case law in this circuit that defines, at least in one context, where it would be an affirmative statement. And in that context, it was a very clear button. I apologize if I may get the facts wrong. Are you thinking about the take-the-bite-out-of-crime case? This is not the one by the others? Or are you maybe thinking of a different case? I'm thinking of a case that might have been like a rape or domestic violence case, and there was a button that these witnesses were wearing that said something along the lines of Was it an affirmative proclamation, you know, violence is a terrible thing, or something like this? You're probably thinking of the Musch Ledeen case. Perhaps. And so in that case, the circuit addressed the kinds of things that would be an affirmative statement that might influence the jury, that might prejudice the proceedings. This button, which the court found, it was not clear what it was. It's anything but that kind of button. And so if you'd like, I could find that case for you. I know we argued it below. It was not raised. The issue of whether or not the wearing of a button is an affirmative statement was not raised either in the appellant's opening brief or in the reply, and so we have them pre-posed to ourselves. My understanding of Rule 608 is it's basically designed quite sensibly. A witness gets up on the stand and tells a story. It's designed to prevent the prosecutor from saying, Well, isn't it true you were a filthy liar in the fifth grade? I mean, you can't do that. It's got to be tied to the specific testimony that we've got here in front of you. Well, this is clearly not just a general attack on character for truthfulness. This evidence is directly related to the testimony. Now, it's not directly related to the testimony on direct unless we say the Purple Heart was itself testimony of the record of the Purple Heart, but it's clearly related in the sense that it tells the jury that instead of the prosecutor telling truthful stories to Mr. Hinkson, that tells the jury, Uh-oh, he was telling lies to Mr. Hinkson. So it's not as though this is coming in out of left field and it's unrelated to the case. This is directly related to the case. So why is this not permissible under 608? The paradigm that you've just raised, Judge, is whether or not we can believe the testimony of a witness, whether that witness has a character for truthfulness or untruthfulness. The rule 608 is designed so that neither party, government or the defense, can throw out there something that perhaps the witness has lied about in the past and then go off and conduct a mini-trial, which would then divert attention from the main issues in the case. But can't you introduce those documents in order to say, he said, Mr. Fisher gets up on the stand, I said, I said, X, Y, and Z to Mr. Hinkson. You now on cross get up and say, well, didn't you lie to Hinkson? Because on direct he said, I told him the following.  You can't introduce impeachment evidence that says, well, weren't you lying when you said that? Well, on direct examination, what he testified to is what he had told Mr. Hinkson about his military experience. That's exactly right. And can't you on cross examination get up and say, well, isn't it true that you lied when you told him that? And when he says, oh, no, I didn't. If you've got evidence that proves he lies, you can't introduce that evidence to prove that the testimony that he gave when he was talking to Hinkson is a lie, you can't do that? That's your argument. I don't think 608 says that. Well, what you could show is that the government's position is that Rule 608 was simply for the government's position is that the collateral matter.  Yes. Because all that matters in this case, Judge, is Mr. Hinkson's state of mind. Let's say, for example, it took me a second to process your question and I have a direct response to it. The government had to prove that Mr. Swisher, Mr. Hinkson, solicited the murder of a federal judge, an assistant U.S. attorney, and an IRS agent. And the government had to prove that by strongly corroborating circumstances appellant counsel notes. When appellant counsel fails, where he's mistaken is the government identified a whole list of corroborating circumstances, including other witnesses and all that parallel. Now, what's critically important in this context was not whether or not Mr. Swisher had actually served in military service. Well, no, I think you can go so far as the jury could have convicted on a theory that Hinkson believed Swisher's stories, and therefore he was soliciting. The jury clearly could have convicted on that. But I don't think it's irrelevant to what the jury believes if the jury all of a sudden realizes that Swisher was lying when he talked to Hinkson. If I'm a juror, that would go into my evaluation of the truthfulness of Swisher's story as to whether or not he was lying then, or maybe he's lying now. That's right, Judge. It's relevant that whether or not Mr. Swisher is a truthful person. And Rule 608 says, with respect to character for truthfulness, the concern that you have that you're limited with respect to the admission of extrinsic evidence. Rule 608 simply precludes that. Now, the— I understand the argument for that. I think we're going over the— If I may, just to be—I'll conclude on this point if the Court wishes, and there are no further questions. All that matters from the government's perspective is Mr. Hinkson's state of mind. If you could have so long as he believed it, then that is why he solicited Mr. Swisher. But if he thought Swisher was a guy who had killed and would kill, that's what's relevant. So if somebody makes a big, enormous lie about their past, it's really not relevant to the question of Mr. Swisher's—Mr. Hinkson's state of mind. You make a good point, might the jury want to know that Mr. Swisher is a liar? And to the rule about this very thing. Under Rule 608, what you can do is you can cross-examine him. What you've come down to is, obviously, it matters whether this guy is a liar because his story about what happened, whether you believe it or not, his story, that it even happened at all, could be a lie. So isn't the real difference here a question of whether, on impeachment, you can offer up the documents in the manner you said, or whether somehow they become substantive evidence? Isn't that really the difference of what could or couldn't happen here? Yes. Depending on whether 608 is in or out. Yes, and going to the harmlessness argument that the government's made, it's very important for the court to keep in mind that the defense did not do what the court allowed it to do. The defense makes this argument. This is the critical information in the case. Swisher, it felt. The court, the government's case, depends on Mr. Swisher. If this is so essential, why didn't they take their best shot at Swisher? Instead, they made a tactical call to rely on their other impeachment of Mr. Swisher, which was lengthy. This is a tactical decision that they've now regretted. And you don't, you can't get multiple bites of the apple first, but in any event, it belies the essential nature of this information that they had a chance to use all this information against Mr. Swisher, chose not to, and although maybe on its own that's not dispositive, it clearly reflects the relative importance in their minds of Mr. Swisher's truthfulness on this particular subject when they had a bunch of other kinds of things to impeach him on. So from the government's standpoint, our view is that even if there was error, and we don't think that there was, that it's harmless. Thank you. I have a question. Judge Hart has a question. I would like to get your perception of what happened when, in cross-examination, Spence pulled out this document that was, I guess it was a DD-214, indicating that Swisher was lying. And then Swisher pulled out another document, which it turns out was fraud. How did you see what happened there? I didn't know. I saw it as a cross-examination that backfired. On the other hand, I saw it as- Yeah, you're right. He certainly would do that. As a trial attorney, I think that's devastating when he comes up with something on the stand, which he obviously had been prepared to do. And it strikes me as a potential sandbaking to get the defense attorney to do that and then show him that he has the correct answer. Well, two things I can say, Judge, in response to that. The first is that you asked what did it seem like at the time. To me, as a trial lawyer, that's where I do most of my work, I thought of it as an incomplete cross-examination. You thought it was what? An incomplete cross-examination. Okay, so you pulled this thing out of your pocket. Well, I have here a letter from the National Personal Records Center saying this thing doesn't exist. How can you explain that the National Personal Records Center has no record of this document that you've just pulled out of your pocket? Well, how did the defense know that? It wasn't because the prosecution had given them any information to indicate that. What happened, Judge, was that the defense did its cross-examination. And after it finished the cross-examination of Mr. Swisher, it was almost like a pardonation moment, somebody comes running into the courthouse waving this piece of paper, and defense counsel approaches the bench and says, Judge, we were going to go into this area, however, now we have information from the National Personal Records Center indicating that Mr. Swisher isn't entitled to wear a Purple Heart, we believe that he is, and so then reopened. Yeah, this is all after the dramatic moment. This is before the dramatic moment. Really? Yes. So they completed their initial cross-examination. They did not get into these matters. Then they got this letter, they asked to reopen. This is literally right as Mr. Sullivan's getting up to do his cross-examination. The court allows counsel to go into this area, and then the events occur. And so, look at that. Well, when did Swisher pull this out of his pocket? What happens is that the defense counsel says, I noticed that you have something on your lapel. What is it? Swisher says it's a Purple Heart. How did you earn this? I'm paraphrasing. How did you earn this? I was in some classified mission rescuing POWs or whatever it was. To wear a Purple Heart, aren't you supposed to? Doesn't a Purple Heart come with paperwork indicating that you've actually earned this medal? And do you have such paperwork? He says, well, as a matter of fact, I do. Here it is. That's how this came up. All right. Thank you. Thank you. You might have some rebuttals, and we've gone on at some length, so let me give you five minutes for your rebuttal. Let's be realistic. Mr. Swisher has called us a defense witness, let us assume, and to show Mr. Hinson's lack of intent. And he knew that Mr. Hinson had the tax case, and he said, hey, he testifies. I went to Dave. I said, I'm a combat veteran, a killer. I'm a Korean War veteran. Can I take care of anybody for you, Dave? And Dave said, no, no, look, I want to do this legally. That's the direct testimony. He didn't have any illegal intent. The government gets up on cross-examination. You said that you told Mr. Hinson you were a Korean War veteran. Isn't that a complete lie? Defense objection. Oh, Your Honor, what Mr. Swisher is, is irrelevant. Only what he told Mr. Hinson. So the jury is not entitled to know that he was lying to Mr. Hinson, and he's lying to the jury, lying to a veteran's record and a combat record. That rebuttal would come in from the government like a knife through hot butter. The fact that a defense witness testified and implied to the jury that he was a combat veteran when all of that was made up would be before the jury in an instant. What the government just said is that from its perspective, all that matters is its theory of what Mr. Hinson thought. Two things. One, yeah, from its perspective, because it doesn't believe the jury, in this case, should hear any information which might lead them to conclude that Swisher was a complete liar and lead to an acquittal. So what kind of a fair trial comes if the government wins this case? It is entitled to call people to the stand who intend to purge themselves clearly, establish the intent to, intend to offer forged documents, do just that, and a jury of the defendant's peers is not allowed to learn that they are looking at a complete fraud and a disgrace. You can't write an opinion in this case that is consistent with our system of justice. You can write an opinion that the government's opinion would be consistent with a totalitarian state where only the government's perspective is allowed to go to the jury. This man came to the stand to purge himself. And the fact is it is very interesting that the government in opening said that he was a Korean War veteran, and yet they very carefully shaped their direct to let those questions wait to cross, suggesting, certainly suggesting, that they were aware that this was a bomb, that they did not intend to explode on direct, let it come on cross, so then we can escape responsibility for the introduction of perjured testimony. Do you have any basis for that statement other than a suggestion? Well, Mr. Katsay said on a couple of times that his responses as to why the letter to the Veterans Administration was dated what it was were speculative. We have a situation in which in opening the government says this man is a Korean War veteran. They say he's a Korean War veteran, which he wasn't, even under his own story. They say that when we talked to him that morning, we said, huh, you would have only been 16 by the time there was a ceasefire. That's when he comes up with the Rambo story about being parachuted or operating behind enemy lines. It certainly suggests that they, once they heard that, did not want to go near this on direct, but were perfectly willing to have it come out on cross. What comes out on cross is perjured. What comes out on cross are false documents. Let me just stop there. If they have any suspicion that that might be false, doesn't the government have an obligation not to put that testimony on? It most assuredly does. Okay. It most assuredly does. So now you're saying the fact that they didn't is somehow makes an inference against them. It permits an inference of cuteness, Your Honor. Oh, we won't ask the question that will elicit the perjury on direct. We'll let it come out on cross, let them proper these documents, and then when there's a subpoena to the defense department and the true documents come in, then they admit that they know some of this, they have the Colbert report, and then they move to exclude the jury from hearing any of this. And it might be relevant to determine, something that I think we in this posture at this time are incapable of determining, it might be relevant to determine when, in fact, the government got the Dowling letter because the facts line suggests that the government got the Dowling letter. I don't say any particular person in the government. It might have gone only to Agent Long, but it suggests that the government got that letter the day before Swisher goes on the stand. Your Honors, I just submit this in closing. This court will do the government a favor if it says, given the new trial motion where all of this was undisputed by then that this was perjury, that in itself is, as it did in Young. Let me ask you this. Would it be appropriate to remand for a factual hearing on all the events surrounding the Dowling letter, when it was given, when it was sent, when it was received, by whom, to whom, and so on? Would that be useful? Your Honor, I would submit this. My client is buried in the worst confinement available in the United States in Florence. I think on the basis of the new trial motion, by which point the perjury is undisputed, the court should reverse at this point. I would suggest that it is doing the government a favor if it reverses now rather than remanding for that hearing because, frankly, the cuteness involved in saying in opening he was a Korean War veteran and then shaping its testimony. I mean, Mr. Taxei just said we didn't ask him whether he was a Korean War veteran after opening in that way. Why not? It certainly suggests that they knew that he was going to perjure himself, and if he was going to perjure himself, they thought they were safe if he did it on cross rather than on direct. I think the record more than suffices to reverse at this time. I think the court would be doing the government a favor to do so. It's fair to Mr. Hickson to do so, but, I mean, if this were remanded for an evidentiary hearing on this question, I think it ought to offer the government the option of stipulating to a reversal because I don't think it's going to be pretty if that hearing is held and the lead prosecutor in this case has to, under oath, explain the sequence of events that led to the unearthing of the status of Swisher as a perjurer. We do know this. We know irrefutably that this man approached the stand intending to commit perjury with documents prepared to prepare him to commit perjury, and he did commit perjury. And in Young, this court said there seems to be a strong suspicion here of knowing use of perjured testimony by the government. We will reverse it on the fact of the perjured testimony itself and do the state, in that case it was the state officials, a favor by doing so. So I'd love to see the truth come out, but I suspect that Mr. Swisher, my client, would pay the price by being confined in Florence until it comes out, and I think the truth is going to bear out that this was at least a reckless use of perjury on the part of the government. Thank you. The case just argued. United States v. Hinkson is submitted. I appreciate the arguments from both counsel on this case. It's very helpful for the court, and we're now adjourned.
judges: Hug, McKeown, W. Fletcher